16 So.3d 1139 (2009)
In re Robert Lee CURRY, III, Paul D. Spillers, and Edwin K. Theus, Jr.
No. 2008-B-2557.
Supreme Court of Louisiana.
Rehearing Denied July 17, 2009.
July 1, 2009.
*1142 Charles Bennett Plattsmier, Baton Rouge, Robert Samuel Kennedy, Jr., Shreveport, for applicant.
Tammy Parker Pratt, Davenport, Files & Kelly, Thomas Williams Davenport, Jr., Monroe, Ottinger Herbert, Paul Joseph Hebert, Lafayette, Theus, Grisham, Davis & Leigh, Paul D. Spillers, Robert Lee Curry, III, Edwin K. Theus, Jr., Monroe, Harry T. Lemmon, for respondent.
Thomas A. Grant, III, Thomas Moore Hayes, III, Donald William Weir, Jr., John David Ziober, Baton Rouge, Michael Allyn Stroud, for amicus curiae, Thomas M. Hayes, III, John David Ziober, Donald Weir, Jr., Thomas A. Grant, III, Edward C. Abell, Jr., M. Allyn Stroud, Charles S. Weems, III, James C. Crigler, Jr.
Emmett Cary Sole, Lake Charles, John Wayne Jewell, New Roads, amicus curiae, for John Wayne Jewell, Emmett C. Sole.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.[*]
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondents, Robert Lee Curry, III, Paul D. Spillers, and Edwin K. Theus, Jr., attorneys licensed to practice law in Louisiana. For the reasons that follow, we suspend respondents from the practice of law for a period of six months, with three months deferred.

UNDERLYING FACTS AND PROCEDURAL HISTORY
The background facts of this case are very complex. Essentially, in the 1980's, Stanley Palowsky and several other individuals formed Gulf States Land and Development, Inc. ("Gulf States") to develop a tract of land located north of Monroe as a residential subdivision known as North Pointe. The business venture was financed by Ouachita National Bank in Monroe, which subsequently became Premier Bank and then Bank One (collectively referred to herein as "ONB"). The multimillion dollar development eventually encountered difficulties, and over two decades, spawned a complex series of more than twenty separate lawsuits involving Mr. Palowsky and ONB, its officers, directors, and attorneys.
In 1985, the Monroe law firm of Theus, Grisham, Davis & Leigh (hereinafter referred to as "TGD & L" or "the firm") assumed the representation of Mr. Palowsky and Gulf States. J. Michael Hart, a partner of TGD & L from 1977 until November 30, 2001, was the attorney who was primarily responsible for the representation. In 1987, Sharon Ingram Marchman joined TGD & L as an associate. She ultimately became a partner of the firm and remained a partner until December 2000, when she was sworn in as a judge of the 4th Judicial District Court. During her tenure with TGD & L, Ms. Marchman worked extensively with Mr. Hart in the representation of Mr. Palowsky and Gulf States.[1]
*1143 In 1988, Mr. Hart filed a lender liability suit against ONB on behalf of Mr. Palowsky and Gulf States, asserting that ONB had breached its loan commitment to Gulf States for the North Pointe development. ONB, in turn, filed suit against Mr. Palowsky and Gulf States alleging default on certain promissory notes owed to ONB and secured by a mortgage on the North Pointe subdivision. This litigation was consolidated for trial purposes, and is referred to herein as the "Gulf States litigation." Mr. Hart billed Mr. Palowsky for his representation in the Gulf States litigation on an hourly basis.
In August 1992, a jury in Ouachita Parish returned a $12.9 million verdict in favor of Mr. Palowsky in the Gulf States litigation. After the jury verdict was rendered, Mr. Palowsky consented to convert the existing hourly fee arrangement for the Gulf States matter to a contingency fee agreement.[2] In October 1992, Mr. Palowsky signed a contingency fee agreement (hereinafter referred to as the "1992 fee agreement") that called for TGD & L to receive a one-third contingency fee on the net recovery from the Gulf States litigation. No copy of the 1992 fee agreement has ever been produced, but according to Mr. Palowsky and Ms. Marchman, it also credited Mr. Palowsky for hourly fees and costs previously paid.
In April 1995, the Court of Appeal, Second Circuit, reduced the $12.9 million judgment in favor of Mr. Palowsky and Gulf States to $2.4 million. This court denied writs in October 1995. Because the judgment as amended on appeal was so complex, the parties turned to the trial court for assistance in interpreting the judgment. In April 1996, the trial court ruled that after taking into account the various awards in favor of Gulf States and offsets against the judgment in favor of ONB for the unpaid promissory notes, Gulf States owed ONB in excess of $500,000. At that point, Gulf States could not develop the North Pointe subdivision, nor could it obtain a loan to pay the balance due to ONB. Further, ONB was in a position to foreclose on its mortgage on the subdivision, which could force Mr. Palowsky's business partners into personal bankruptcy.
While the trial court's April 1996 ruling was pending on appeal before the Second Circuit, Mr. Palowsky approached R. L. Davis, Jr., a senior partner of TGD & L, and asked that the firm act as guarantor on a $950,000 loan that would allow Gulf States to pay off ONB and develop the North Pointe subdivision. Mr. Davis agreed, conditioned upon Mr. Palowsky's renegotiating the 1992 fee agreement on terms more favorable to the firm.
Initially, Mr. Davis proposed to Mr. Palowsky that TGD & L would agree to guarantee the loan in exchange for a percentage of the profits of the sale of lots in the North Pointe subdivision. Mr. Palowsky agreed to this proposal, and the firm set out to draft a new fee agreement. Respondent, Mr. Spillers, was primarily responsible for this task, with respondent, Mr. Curry, overseeing the process.[3] *1144 During the next few months, Mr. Spillers circulated numerous drafts of a proposed fee agreement among the partners of TGD & L for review and comment. In July 1996, Ms. Marchman wrote a memorandum to Mr. Spillers advising that, at her request, Mr. Palowsky had offered a second, alternative option by which the firm could recover its legal fees:
As I have already indicated to you, Stanley and I are both confident that the Second Circuit will give us an award for at least $1.8 million. In anticipation that when that occurs, some of the partners would be rather [sic] have a contingency fee agreement on the amount of that recovery instead of waiting for completion of the subdivision development to recover fees, Stanley has agreed to give us the following option which should be incorporated into the [fee] agreement. Understand, though, that this was not part of the agreement which Stanley reached with [Mr. Davis]. This is something that Stanley has offered at my request.
Mr. Spillers incorporated this language into subsequent draft versions of the fee agreement. Mr. Curry also circulated revisions of the agreement among the partners for approval.
In September 1996, a final fee agreement was reached between Mr. Palowsky and TGD & L (hereinafter referred to as the "1996 fee agreement").[4] Pursuant to the 1996 fee agreement, TGD & L guaranteed a $950,000 loan to Gulf States from First Republic Bank in Monroe to pay off ONB's judgment and to complete the North Pointe subdivision so that lots could be sold. The agreement further provided that as consideration for granting the guaranty, "the undersigned wish to and do hereby amend and restate the agreement regarding legal fees and reasonable expenses due by GULF STATES to TGD & L" in the Gulf States litigation.[5] As set forth in Ms. Marchman's memorandum, the firm had two options in calculating its fee. Under "Option One," TGD & L was entitled to take as its "contingency fee" a percentage of the net profit of the sale of lots in the North Pointe subdivision, either by individual or bulk sales, together with the payment of expenses incurred by the firm in connection with the Gulf States litigation. "Option Two" permitted the firm to take a contingency fee of one-third of the amount of any "award in favor of Gulf States" in the litigation then pending on appeal in the Second Circuit, plus payment of expenses:
One of the matters in the Bank Litigation and currently lodged as an appeal in the Second Circuit Court of Appeal, Docket Nos. ___, may result in an award in favor of GULF STATES. In the event the Second Circuit were to enter a judgment in favor of GULF STATES, then TGD & L shall have an option to take a contingency fee with respect to this award in lieu of any fee *1145 to be generated attributable to the sale of subdivision lots. TGD & L shall have 30 days after entry of any such judgment to notify GULF STATES, in writing, of its election to take a 1/3 contingency fee with respect to any such award. In the event TGD & L were to elect to take a contingency fee with respect to any such award, then TGD & L shall have no right to receive any fee whatsoever with respect to any other GULF STATES' Bank Litigation EXCEPT Stanley Palowsky's personal suit, Docket No. ___. In the event TGD & L elects to take a contingency fee with respect to the Second Circuit's judgment in favor of GULF STATES, then the contingency fee will be 1/3 of the amount recovered, said amount to include the funds previously deposited into the Court Registry and not reduced by any funds borrowed by GULF STATES from First Republic Bank to satisfy the debt owed by GULF STATES to BANK ONE. For example, if the award by the Second Circuit is $1,800,000.00, the amount in the Court Registry is $300,000.00 and the amount borrowed from First Republic is $600,000.00 then the 1/3 contingency fee will be $700,000.00 (1/3 of $2,100,000.00). Under this option GULF STATES will be obligated to pay, in addition to the contingency fee, all reasonable expenses incurred by TGD & L in connection with the Bank Litigation. Notwithstanding anything in this paragraph to the contrary, in the event TGD & L elects to exercise this option and take as its fee the 1/3 of the amount awarded by the Second Circuit and, thereafter, that award be reversed in whole or in part by the Louisiana Supreme Court, then TGD & L shall have the choice to revert to the contingency fee based on net profits from the sale of the subdivision set forth herein. [All emphasis in original.]
Respondent, Mr. Curry, signed the 1996 fee agreement on behalf of TGD & L. To further protect the firm's interest, respondent, Mr. Theus, obtained a $2 million mortgage on behalf of the firm against the North Pointe subdivision to "secure all sums due by the Corporation to [TGD & L] under the Fee Agreement."
In April 1997, the Court of Appeal, Second Circuit reversed the trial court's judgment, holding that under a proper interpretation of the original judgment, Gulf States was a net creditor of ONB. In May 1997, Mr. Curry, on behalf of TGD & L, gave Mr. Palowsky written notice that the firm intended to exercise Option Two of the fee agreement, subject to the provision that the firm could rescind its election if the Second Circuit's award was later reduced in whole or in part. In September 1997, the court of appeal's judgment became final upon this court's denial of writs.
TGD & L calculated the total amount of the judgment against ONB to be $1.8 million and that the total legal fee due to the firm under the 1996 fee agreement was therefore $600,000. After ONB paid $1,049,000 of the judgment to Gulf States,[6] *1146 Gulf States paid TGD & L legal fees of one-third of that amountapproximately $349,000as calculated by respondent, Mr. Theus.[7] Gulf States also reimbursed TGD & L for $14,000 in expenses. This was the last payment of any sums to TGD & L by Mr. Palowsky or Gulf States.
In January 1998, Mr. Palowsky wrote a letter to respondent, Mr. Theus, requesting a complete accounting of all sums he had paid to TGD & L since 1986. Mr. Palowsky's request was prompted by his receipt of a September 1997 invoice for $22,000 in hourly legal fees for title work and other legal services rendered by the firm in connection with the closing of the First Republic Bank loan.[8] After unsuccessfully attempting to compile the accounting himself, Mr. Theus turned the matter over to Ms. Marchman in August 1998 with instructions to tabulate all sums paid to the firm by Gulf States and provide Mr. Palowsky with an accounting.
Ms. Marchman completed her analysis in October 1998 and reported to Mr. Theus that "it appears that we have overcharged" Mr. Palowsky a net sum of $38,000 in legal fees and expenses in his various legal matters. Mr. Theus and the other partners of TGD & L (excluding Mr. Hart) disputed Ms. Marchman's analysis, claiming that the firm could not have overcharged Mr. Palowsky anything because he still owed the firm approximately $250,000 under the 1996 fee agreement in connection with the Gulf States litigation plus expenses advanced by the firm in his personal suit.[9] Despite these competing claims, no definitive resolution of the issue was reached at that time, as the personal suit was ongoing and Mr. Palowsky did not wish to jeopardize his relationship with the firm.
In September 2001, Mr. Hart tried the personal suit before a jury, which returned a $19.4 million verdict in favor of Mr. Palowsky and against ONB. Mr. Hart withdrew from TGD & L in November 2001.[10]
The bank appealed the judgment in the personal suit. In 2002, while the appeal was pending, the parties entered into a confidential settlement of the verdict.
In 2003, attorney Joseph R. Ward, Jr. wrote TGD & L on behalf of Mr. Palowsky and requested a full and final accounting of all sums paid to the firm in connection with the Gulf States litigation. Respondent, Mr. Spillers, initially replied to this demand by claiming that Mr. Palowsky owed an accounting to TGD & L "for all recoveries made, all expenses paid and all fees paid in connection with all matters with respect to which an accounting has *1147 been demanded." Pressed further, Mr. Spillers then forwarded to Mr. Ward more than nine hundred pages of "various accounting statements" which "itemize expenses, advances, and payments credited to the various files comprising the `Palowsky' litigation." Mr. Spillers conceded that the firm "do[es] not consider the enclosed to be the `full and complete' accounting that was requested by" Mr. Palowsky. However, Mr. Spillers asserted that because Mr. Hart had taken Mr. Palowsky's files with him when he left TGD & L in November 2001, the firm was not in possession of the requisite records which would enable it to provide a "full and complete" accounting. Despite the asserted absence of these records, respondents nonetheless insisted that the firm owed Mr. Palowsky no money and that instead Mr. Palowsky owed the firm $128,000 in costs and expenses paid on his behalf in connection with the personal suit. Moreover, the firm reiterated its demand for payment of the September 1997 invoice for legal services in the amount of $22,000, and for the unpaid portion (approximately $250,000) of the $600,000 in legal fees the firm claimed it was due under the 1996 fee agreement.

DISCIPLINARY PROCEEDINGS

Formal Charges
In 2003, Mr. Palowsky filed a complaint against respondents with the ODC. In 2005, the ODC filed two counts of formal charges against respondents jointly. In Count I, the ODC alleged that respondents failed to prepare or provide Mr. Palowsky with a settlement disbursement statement upon the conclusion of the Gulf States litigation, as required by Rule 1.5(c) (upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination) of the Rules of Professional Conduct. Accordingly, the ODC alleged that TGD & L retained substantial sums of client funds which respondents have since refused to account for or return to Mr. Palowsky.
In Count II of the formal charges, the ODC alleged that through their acts and omissions, both individually and in concert with each other, respondents have committed multiple violations of the Rules of Professional Conduct, as follows:
1. By impermissibly acquiring a proprietary interest in the cause of action or subject matter of litigation belonging to a client outside the confines of a contingency fee contract, respondents have violated Rules 1.8(a) (a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client) and 1.8(j) (a lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client).
2. Before obtaining the client's agreement to enter into a business transaction with the law firm, respondents failed to affirmatively advise the client that he should seek independent, disinterested legal counsel to protect his interests, in violation of Rule 1.8(a).
3. By taking advantage of a client in necessitous circumstances and charging the client a contingency fee in circumstances where no serious risk of non-recovery existed, respondents permitted their own interests in collecting a fee to override their obligation to protect their client's interests and have engaged in a conflict of interest, in violation of Rules *1148 1.7(b) (a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests) and 1.8.
4. By failing or refusing to credit the client with hourly fees and costs previously paid, and in refusing to refund said sums after being advised of their unconditional obligation to do so, respondents have violated Rules 1.15(b) (a lawyer shall promptly deliver to a client or third person any funds or property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property), 1.16(d) (obligations upon termination of the representation), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).[11]
5. By failing or refusing to provide, despite repeated demands by the client, a reasonable accounting of all sums paid to the firm by the client and all sums expended by the firm on the client's behalf in the Gulf States litigation, respondents have violated Rules 1.15(a) (complete records of a lawyer's client trust account shall be kept and preserved for a period of five years after termination of the representation), 1.15(b), 1.15(c) (when in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests), and 1.16(d).
6. By refusing to acknowledge receipt of, and failing to credit to the client's account, cash payments totaling $19,000 made directly to them by Mr. Palowsky, respondents, Mr. Spillers and Mr. Theus, have violated Rule 8.4(c).[12]
7. By failing to maintain complete financial records of account funds and other property belonging to a client for a period of five years from the conclusion of the representation, respondents have violated Rule 1.15(a).
Respondents filed separate answers to the formal charges denying any misconduct. Specifically, respondents contended that the primary responsibility for handling Mr. Palowsky's legal affairs rested with Mr. Hart, not with them. Each respondent, however, admitted knowledge of the 1996 fee agreement.[13] Mr. Spillers and Mr. Theus also admitted they attempted to make an accounting to Mr. Palowsky. The matter then proceeded to a formal hearing, at which both parties introduced *1149 volumes of documentary evidence. Numerous witnesses were also called to testify, including Mr. Palowsky; Fred Sartor, a former partner of TGD & L; Judge Marchman; Mr. Ward; Judge C. Wendell Manning, a former partner of TGD & L; Mr. Curry; Charles Heck, a former partner of TGD & L; Mr. Spillers; Mr. Theus; and Sedric Banks.

Hearing Committee Report
After considering the evidence and testimony presented at the hearing, the hearing committee made the following findings:

Finding of Fact No. 1
The committee determined that TGD & L collected a contingent fee plus expenses from Mr. Palowsky under the 1996 fee agreement, noting that respondents admitted they were partners in the firm when the fee was charged. Citing Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1978), the committee found the 1996 fee agreement, which respondents characterized as a "hybrid fee agreement," did not satisfy the requirements for a contingency fee agreement because it was not dependent on the outcome of the client's claim, nor did the attorney bear the same risk of loss as the client.[14] Consequently, the committee found that the evidence established by clear and convincing means that the fee agreement was per se invalid and unenforceable as a contingent fee contract. Therefore, the collection of a fee out of the subject matter of the suit without a valid contingent fee agreement was the acquisition of a proprietary interest in the subject matter of the suit in violation of Rules 1.8(a) and (j). The committee therefore found that respondents violated Rules 1.8(a) and (j) inasmuch as they were partners of the firm which collected a contingent fee without a valid and enforceable contingent fee agreement.

Finding of Fact No. 2
The committee found that respondents did not disclose to Mr. Palowsky that he should seek the advice of independent legal counsel in connection with executing the fee agreement. However, the committee determined that the evidence is also clear and convincing that Mr. Hart and Ms. Marchman were primarily responsible for this task. Therefore, while the committee found a violation by respondents of Rule 1.8(a), the committee noted respondents acted "by omission and not knowingly," as they assumed Mr. Hart or Ms. Marchman would have advised Mr. Palowsky to seek the advice of counsel.

Finding of Fact No. 3
The committee determined respondents violated Rule 1.8 by permitting their own interest in collecting a fee to override their obligation to their client. The committee accepted the ODC's contention that respondents arranged for a contingency fee where there was little risk of non-recovery and were able to do so by taking advantage of the client's necessitous circumstances, i.e., pending foreclosure and bankruptcy. In support, the committee observed that prior to the 1996 fee agreement, the firm's recovery of a contingent *1150 fee was dependent on the 1992 fee agreement, which simply provided for the recovery of a one-third contingent fee plus expenses. The committee found the 1996 fee agreement placed the firm in a better position by providing a means for the firm to collect a fee even if no recovery was made in the bank litigation. The committee emphasized that the client was in necessitous circumstances at the time that occurred. Therefore, the committee determined that the respondents engaged in a conflict of interest in violation of Rule 1.8(a).

Finding of Fact No. 4
The committee found the evidence of how much and what was paid to the firm prior to the recovery of the contingent fee to be in conflict. In particular, it observed that while Mr. Palowsky contended that he paid over $200,000 in fees to the firm for which he should have been reimbursed out of the contingent fee that was recovered in 1997, respondents produced a spreadsheet detailing numerous matters handled by the firm on behalf of Gulf States and Mr. Palowsky other than the bank litigation matters. Given the conflict in the evidence as to exactly how much Mr. Palowsky and/or Gulf States paid in hourly fees that were to be covered by the contingent fee arrangement, the committee found that the ODC failed to prove by clear and convincing evidence that respondents violated Rules 1.15(b), 1.16(d), and 8.4(c) by failing or refusing to credit the client with hourly fees and costs previously paid against the contingent fee that the firm collected in 1997.

Finding of Fact No. 5
The committee found that the firm, and through the firm respondents, have provided an accounting to Mr. Palowsky. Although the committee acknowledged Mr. Palowsky was not satisfied with the accounting, it did not find any violation of the rules. It further noted the fact that there is a dispute as to the accuracy of the accounting does not rise to the level of a violation of Rules 1.15(a)(b) and (c) or 1.16(d).

Finding of Fact No. 6
The committee found there was insufficient evidence to prove that cash payments were ever made by Mr. Palowsky to two of the respondents, Mr. Spillers and Mr. Theus. The committee observed the only affirmative evidence in this regard was Mr. Palowsky's self-serving testimony which was denied by Mr. Spillers and Mr. Theus. Furthermore, it noted Mr. Palowsky's own accounting sheets failed to show the cash payments. Therefore, the committee found the ODC failed to prove by clear and convincing evidence that Mr. Spillers or Mr. Theus violated Rule 8.4(c).

Finding of Fact No. 7
Addressing the ODC's allegation that respondents violated Rule 1.15(a) by failing to maintain complete financial records of account funds and other property belonging to the client for the requisite period of five years from the conclusion of the representation, the committee explained that the primary responsibility for the representation of Mr. Palowsky rested with Mr. Hart. It noted that Mr. Hart left the firm in November 2001 and took Mr. Palowsky's records with him. The committee reasoned that Mr. Hart presumably preserved the file information and records. Accordingly, the committee found no violation of Rule 1.15(a) by respondents.

Finding of Fact No. 8
Finally, the committee addressed whether respondents violated Rule 1.5(c) by failing to provide the client with a written statement showing the outcome of the contingent fee matter and the remittance to the client and the method of its determination. The committee found it was undisputed *1151 that a contingent fee and more than $14,000 in expenses were charged under the 1996 fee agreement, but no disbursement statement as required by Rule 1.5(c) was produced by the respondents showing how that fee was distributed.[15] Therefore, because respondents failed to produce a disbursement sheet, the committee found they violated Rule 1.5(c). However, the committee found this to be an omission and not done knowingly. Mr. Hart was primarily responsible for the representation of Mr. Palowsky, and his partners had the right to assume that he would prepare such a disbursement statement.

Sanctions
The committee determined that under the ABA's Standards for Imposing Lawyer Sanctions, the baseline sanction for respondents' misconduct is suspension. In this case, respondents knowingly collected a contingent fee under an agreement that was unenforceable as such. They also knowingly acquired a proprietary interest in the cause of action outside a contingency fee arrangement, and knowingly took advantage of a client in necessitous circumstances by converting a fee agreement that was entirely dependent upon the outcome of the case and recovery to one which guaranteed recovery of a fee. Respondents' conduct could have potentially caused injury to the client. If the Gulf States litigation had been lost, the client would have nonetheless had to pay a contingent fee out of the sale of property owned by the client.
As aggravating factors, the committee found refusal to acknowledge the wrongful nature of the conduct and substantial experience in the practice of law.[16] The committee found the following mitigating circumstances apply: absence of a prior disciplinary record and a cooperative attitude toward the disciplinary proceedings. The committee also observed that Mr. Palowsky was not a vulnerable victim because he was an "experienced litigator" and that respondents had not committed multiple offenses.
Considering that some of respondents' violations were knowing, the committee determined that a two-year period of suspension is appropriate in this case. However, in light of the mitigating circumstances, the committee recommended that all but six months of the suspension be deferred, subject to the condition that respondents attend the Louisiana State Bar Association's Ethics School. The committee also recommended that respondents be assessed with all costs and expenses of these proceedings.
Both respondents and the ODC objected to various aspects of the hearing committee's report. Respondents also objected to the sanction recommended by the committee, arguing that no discipline is appropriate in this case and that the formal charges should be dismissed.

Disciplinary Board Recommendation
After review, the disciplinary board determined that the hearing committee's factual findings are not manifestly erroneous. The board found respondents violated duties owed to their client and the profession, determining their conduct was negligent *1152 in some instances and knowing in others. However, the board found there was little injury to the client, as the firm never exercised its option under the improper portion of the contingency fee agreement. Rather, it found the firm collected a standard contingency fee, as it would have under the previous contingency fee agreement with Mr. Palowsky. In other words, the firm did not receive any actual benefit from the 1996 fee agreement that it would not have otherwise received under the 1992 contingency fee contract. Further, the board observed that the potential injury to Mr. Palowsky was low because the 1996 fee agreement gave the firm an interest in "net profits," which are not guaranteed, and Mr. Palowsky had control over when the net profits would be distributed to the firm, if any. Nevertheless, the board recognized respondents knowingly executed an invalid contingency fee contract, knowingly entered into an improper business transaction with a client, and knowingly gained an improper proprietary interest in the client's cause of action. Considering the ABA's Standards for Imposing Lawyer Sanctions, the board found the applicable baseline sanction is suspension.
As aggravating factors, the board found refusal to acknowledge the wrongful nature of the conduct and substantial experience in the practice of law. The board found the following mitigating circumstances apply: absence of a prior disciplinary record and a cooperative attitude toward the disciplinary proceedings. Considering all the circumstances, the board found the mitigating factors outweigh the aggravating factors.
In determining an appropriate sanction, the board noted that the instant case "presents a unique set of circumstances and issues that have not been fully developed by caselaw." However, the board noted that this court has decided several cases involving variations on the conflict of interest theme, with sanctions ranging from fully deferred suspensions to disbarment. The board concluded this case falls on the more lenient end of the spectrum. While there is no doubt that respondents crafted the "contingency" fee agreement to essentially ensure some type of fee recovery, and thereby put their own interests ahead of those of Mr. Palowsky, respondents did not take advantage of a vulnerable victim. Mr. Palowsky participated in the drafting of the terms of the contract and signed it without any duress exerted upon him by the firm. Further, respondents have no prior disciplinary history and no history of improper business transactions with clients. Rather, a previous relationship existed between Mr. Palowsky and the firm which was complicated by the introduction of a conflict of interest, without the proper safeguards taken or disclaimers made to the client.
Based on this reasoning, the board recommended that respondents be suspended from the practice of law for one year, fully deferred, subject to a one-year period of unsupervised probation. Four board members dissented and would recommend a harsher sanction.
Both respondents and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana *1153 State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
While this case is very factually complex, we believe the allegations against respondents may be divided into two broad categories: (1) allegations involving business transaction and conflict of interest issues, and (2) allegations involving accounting violations. We will address these categories separately.

Business Transaction/Conflict of Interest Issues
The allegations with regard to this category revolve around respondents' 1996 fee agreement. The ODC submits that respondents entered into a business transaction with their client which was not fair and reasonable to the client and without giving their client a reasonable opportunity to seek the advice of independent counsel in the transaction, in violation of Rule 1.8. The ODC further asserts by entering into this agreement, respondents placed their own interests ahead of those of their client, thereby violating Rule 1.7(b).
A review of the 1996 fee agreement reveals that it is a highly unusual arrangement. Pursuant to that agreement, the firm guaranteed a $950,000 loan to Gulf States from a bank in order to complete the North Pointe subdivision so that lots could be sold. The agreement further provides the firm two separate options whereby it may recover legal fees in the Gulf States litigation. One option amounted to a standard contingency fee under which the firm was entitled to recover one-third of the amount of any award in favor of Gulf States in the litigation then pending on appeal. However, another option permitted the firm to recover a percentage of the net profit of the sale of lots in the North Pointe subdivision, either by individual or bulk sales. Payment of the fee under this option was not conditioned to any degree on the success or failure of the Gulf States litigation. Moreover, under the agreement, the firm could elect the option under which it chose to recover after the Gulf States litigation had concluded.
Much discussion in the parties' briefs and the brief of the amici centers on whether Louisiana law recognizes a so-called "hybrid" or "mixed" fee agreement which allows a lawyer to seek recovery from sources other than a traditional contingency fee. However, we need not resolve that question in order to decide the case at bar. Rather, we find that to the extent respondents attempted to enter into a business arrangement with their client, they did not follow the appropriate ethical strictures.[17]
At the time of the 1996 agreement, Rule 1.8 of the Rules of Professional Conduct provided, in pertinent part:
(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

*1154 (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) The client consents in writing thereto.
* * *
(j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:
(1) Acquire a lien granted by law to secure the lawyer's fee or expenses; and
(2) Contract with a client for a reasonable contingent fee in a civil case.
Respondents argue that the terms of the 1996 fee agreement were fair and reasonable to Mr. Palowsky and the Gulf States entities because the firm received no additional consideration for guaranteeing the $950,000 loan to Gulf States and it would receive no more under the 1996 fee agreement than it would have received under the 1992 fee agreement. We disagree. As the hearing committee explained, under the 1992 fee agreement, the firm's recovery of a contingent fee was limited to a recovery of a one-third contingent fee plus expenses. By contrast, the 1996 fee agreement provided a means for the firm to collect a fee even if no recovery was made in the Gulf States litigation. Thus, it is clear the firm used the guaranty of the $950,000 loan as leverage to insert terms into the fee agreement which it perceived to be more favorable.
Moreover, even assuming for sake of argument that the 1996 fee agreement was fair and reasonable, the undisputed evidence establishes that respondents did not give their client an opportunity to seek the advice of independent counsel regarding the transaction. Although respondents suggest that Mr. Palowsky is a sophisticated businessman and experienced developer, the unusual nature of the 1996 fee agreement should have prompted respondents to urge him to have independent counsel review the arrangement.[18] Under these circumstances, we find respondents violated Rule 1.8.
For similar reasons, we find respondents' actions violated the conflict of interest provisions of Rule 1.7(b). At the time of the 1996 fee agreement, that rule provided, in pertinent part:
A lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents after consultation. . . .
As discussed above, the 1996 fee agreement had the effect of placing respondents in a better position than they had been in under the 1992 fee agreement. Additionally, *1155 the firm's decision to guarantee the $950,000 loan made to Gulf States impacted the representation by causing the firm to consider its own interests as well as those of its client. Under these circumstances, we conclude respondents' representation of their client was materially limited by their own interests, thereby violating Rule 1.7(b).

Failure to Account Violations
At the time of the representation in this case, Rule 1.15(a) provided, in pertinent part:
A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a bank or similar institution in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person.... Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
Rule 1.15(b) provided, in pertinent part, that "a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." The ODC alleges that respondents failed to properly maintain records regarding the representation of Mr. Palowsky and Gulf States and, despite repeated demands by Mr. Palowsky between 1996-2003, respondents have never provided him with an accounting.
Both the hearing committee and the disciplinary board rejected these charges, reasoning that the evidence in the record established that Mr. Hart controlled the Palowsky/Gulf States files while he was at the firm and took these files with him when he left the firm in 2001. Additionally, they found that respondents did provide an accounting, even though the accounting may not have been to Mr. Palowsky's satisfaction.
At the outset, we note the "accounting" to which the committee and board referred consisted of nine hundred and twenty pages of documents, consisting primarily of hourly billing and cost invoices generated from the firm's computer records. To suggest that this mass of paper may be called an accounting in compliance with Rule 1.15(b) is to make an utter mockery of that rule. Moreover, respondent, Mr. Spillers, acknowledged in a 2003 letter to Mr. Palowsky's attorney that the documents did not constitute an accounting, explaining, "[w]e do not consider the enclosed to be the `full and complete' accounting that was requested by the clients." Thus, the hearing committee's factual finding that respondents provided an accounting is clearly wrong and must be rejected.[19]
Likewise, to the extent the hearing committee determined Mr. Hart's removal of the files made it impossible for respondents *1156 to render an accounting, we find such a conclusion to be unsupported by the record. As a threshold matter, we note it is by no means clear from the record whether Mr. Hart actually took the financial records relating to the Palowsky/Gulf States litigation at the time he left the firm.[20] However, assuming for sake of argument that he did so, the record reveals that other means were available to respondents whereby they could have rendered an accounting. In particular, the firm's bookkeeper testified that the firm retained numerous financial documents from the Palowsky litigation, such as cancelled checks, records of deposits, and ledger entries. Similarly, Will Sartor, a member of the firm who assisted Mr. Theus in the attempted 1998 accounting, testified the "bills themselves should have reflected exactly what's paid by the client, and would have been entered into our accounting system...." Given this evidence, we find no impediment existed to respondents rendering an accounting as required by Rule 1.15(b).[21]
The ODC further alleges respondents violated Rule 1.16(d), which provides, in pertinent part, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned." Specifically, the ODC asserts respondents violated this rule by refusing to credit Mr. Palowsky with hourly fees and costs previously paid against the contingent fee.
The hearing committee and disciplinary board determined, among other things,[22] that there was no clear and convincing evidence that the firm owed a refund of fees to Mr. Palowsky/Gulf States. Thus, they concluded this rule was not violated by respondents.
Based on our review of the record, we cannot say this finding is manifestly erroneous. Mr. Palowsky's testimony indicates he paid over $200,000 in hourly fees and costs, which should have been credited against the contingency fee. However, respondents produced evidence that the firm handled matters other than the bank litigation matter on Mr. Palowsky's behalf which were not covered by the contingency fee agreements. Under these circumstances, we cannot say the ODC has established by clear and convincing evidence that respondents violated Rule 1.16(d) by failing to credit Mr. Palowsky's hourly fees against the contingency fee. However, insofar as Rule 1.16(d) requires respondents to furnish an accounting to their client, we find respondents violated this portion of the rule for the reasons contained in our discussion of the Rule 1.15(b) violation.
*1157 Finally, the ODC alleges respondents violated Rule 8.4(c), which prohibits an attorney from engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation." Specifically, the ODC asserts two of the respondents (Mr. Spillers and Mr. Theus) failed to credit Mr. Palowsky's account with cash payments made by him totaling $19,000.
In finding the committee correctly rejected this charge, the board observed there was no evidence, other than Mr. Palowsky's "self-serving" testimony, to establish the existence of the alleged cash payments. Our review of the record indicates that while there is some corroboration for Mr. Palowsky's testimony, it does not rise to the level of clear and convincing proof. Accordingly, we see no manifest error in the committee's finding that this charge was not proven.

Summary of Rule Violations
In summary, we find the record establishes respondents violated Rule 1.7(b) because their representation of their client was materially limited by their own interests. We further find respondents violated Rule 1.8 by entering into an unfair business transaction with their client and failing to advise their client to seek the advice of independent counsel before entering into the agreement. Finally, we find respondents violated Rules 1.15(b) and 1.16(d) by failing to render a proper accounting to their client.

Sanctions
Having found professional misconduct, we now turn to a determination of the appropriate sanction for respondents' actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
A review of our prior cases reveals little analogous jurisprudence, which is not surprising given the unusual facts of this case. Unlike a typical representation with a limited objective, the representation in the instant case developed and evolved over the course of many years. Seen in this light, we do not believe respondents acted with any overarching intent to cause harm to their client. Nonetheless, this case should serve as a cautionary tale, demonstrating the need to maintain strict ethical boundaries between attorney and client and the wisdom of resisting the temptation to see the client as a business partner. Adherence to the prophylactic requirements of Rules 1.7 and 1.8, as well as prompt and scrupulous attention to the client's request for an accounting, would have obviated many of the problems faced by respondents in this case.
Considering the facts of the case as a whole, we conclude the appropriate baseline sanction to be a suspension. In aggravation, we recognize respondents' refusal to acknowledge the wrongful nature of their conduct and their substantial experience in the practice of law. However, in mitigation, we find respondents have no prior disciplinary record and have demonstrated a cooperative attitude toward these disciplinary proceedings, despite their failure to admit their transgressions.
Mindful of all these factors, we will suspend respondents from the practice of law for a period of six months, deferring three months of the suspension.

*1158 DECREE
Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Robert Lee Curry, III, Louisiana Bar Roll number 4672, be and he hereby is suspended from the practice of law for six months, with three months deferred. It is further ordered that Paul D. Spillers, Louisiana Bar Roll number 12341, be and he hereby is suspended from the practice of law for six months, with three months deferred. It is further ordered that Edwin K. Theus, Jr., Louisiana Bar Roll number 12728, be and he hereby is suspended from the practice of law for six months, with three months deferred. All costs and expenses in the matter are assessed against respondents in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
VICTORY, J., dissents and assigns reasons.
VICTORY, J., dissents.
As noted in the majority opinion, attorney disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). I cannot agree that the alleged violations found by the majority were proven by clear and convincing evidence as required by our rules. See La. S.Ct. Rule XIX, § 18(C). The majority asserts that the allegations against respondents may be divided into two broad categories: (1) allegations involving business transaction and conflict of interest issues, and (2) allegations involving accounting violations. I will address each of these categories separately.

Business Transaction and Conflict of Interest Issues
After reviewing the allegations involving business transaction and conflict of interest issues, the majority finds the respondents violated Rule 1.8(a)[1] and Rule 1.7(b). I will analyze each of these alleged rule violations in turn.
The majority first claims that the respondents have violated Rule 1.8(a). At the time of the alleged misconduct, Rule 1.8(a) of the Rules of Professional Conduct provided that an attorney may enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client if:
(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) The client consents in writing thereto.[emphasis added].
The majority concludes that the respondents have violated the above provision because: (1) the business transaction at *1159 issue, the 1996 fee agreement, was not "fair and reasonable," and (2) the respondents failed to ensure Mr. Palowsky had a "reasonable opportunity to seek the advice of independent counsel." Both of these findings are in error.
To support its finding that the business transaction in question was not a "fair and reasonable" one, the majority relies solely on the observation that the 1996 fee agreement provided a means for the firm to collect a fee even if no recovery was made in the Gulf States litigation. The majority states, "it is clear the firm used the guaranty of the $950,000 loan as leverage to insert terms into the fee agreement which it perceived to be more favorable." At p. 1154. It seems that the majority has concluded that the respondents should have either allowed Mr. Palowsky and or his partners to go bankrupt or should have elected to bear the risk of default on a loan of nearly one-million dollars for no additional remuneration. The notion that the firm should have allowed Mr. Palowsky to go bankrupt seems callous, and the implicit argument that the firm should have accepted the risk of default at no additional costs disregards one of the most ancient and well established maxims of human commerce, that the chance of profit must go with the risk of disaster. See Justinian's Institutes § 3.23, at 115 (Peter Birks & Grant McLeod eds., Cornell University Press 1987). It was not unreasonable or unfair for respondents to seek additional security in return for accepting a greater risk.
The majority's conclusion that respondents did not given Mr. Palowsky a "reasonable opportunity to seek the advice of independent counsel" in violation of Rule 1.8(a)(2) is also in error. To support this conclusion the majority relies solely on an extraordinary interpretation of the version of Rule 1.8(a)(2) which was in effect during the relevant time period. The majority finds that Rule 1.8(a)(2), as it existed at the time of the alleged misconduct,[2] imposed an affirmative duty upon the respondents to urge Mr. Palowsky to have independent counsel review the 1996 fee agreement. This interpretation finds no support in a plain reading of the pertinent text. During the time period at issue, Rule 1.8(a)(2), on its face, simply established a temporal requirement. Under the rule, a client could not be forced to render an immediate, rash decision regarding a transaction with their lawyer. A client had to be given a "reasonable opportunity" or time period[3] to consider the implications of any such arrangement and to "seek" independent counsel. Rule 1.8(a)(2). The 1996 fee agreement was constructed over the course of several months, and Mr. Palowsky was presented *1160 with several drafts before signing a final version. There is simply no evidence that Mr. Palowsky was not given a reasonable opportunity to seek the advice of independent counsel.
The majority also concludes that the respondents have violated Rule 1.7(b). At the time of the alleged misconduct, that rule, in pertinent part, stated:
A lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents after consultation....
The majority concludes that the respondents' law firm's representation of the client was "materially limited" by their own interests after the respondents' firm adopted the 1996 fee agreement, thereby violating the above provision. However, this finding seems to stand in stark contradiction to the plain terms of the 1996 fee agreement. By its very design, the fee agreement indicates uncertainty as to which method of remuneration, a percentage of the final judgment in the Gulf States litigation or a percentage of the net profits from the sales of the subdivision lots, would yield the greater monetary award for the firm. Thus, it is illogical to claim that by entering into the 1996 fee agreement the respondents' firm was inspired to limit their representation or provide a lower quality of representation. Such a reaction would have reduced the firm's prospects of obtaining the maximum monetary award possible. Rather, under the 1996 fee agreement, the firm was inspired to work diligently to maximize the client's fortunes as this would, in turn, result in the maximization of the firm's fortunes.

Allegations Involving Accounting Violations
After reviewing the allegations involving accounting violations, the majority finds the respondents violated Rule 1.15(b) and 1.16(d) (insofar as this rule requires respondents to furnish an accounting to their client). As the majority bases its findings regarding Rule 1.16(d) completely on the reasons contained in their discussion of Rule 1.15(b), my analysis of the alleged 1.15(b) violation below will, in effect, address the purported violation of both rules.
At the time of the alleged misconduct, Rule 1.15(b) of the Rules of Professional Conduct provided, in pertinent part, as follows:
[A] lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
As the majority opinion notes, after a review of the entire record, both the hearing committee and the disciplinary board rejected the charge that the respondents violated Rule 1.15(b).
The disciplinary board found that "[t]here is no dispute that Mr. Hart controlled the Palowsky/GSLD files while he was at TGD & L," and that, "there is no dispute that, as the lawyer for Mr. Palowsky/GSLD, Mr. Hart was responsible for handling the financial aspects of the Palowsky/GSLD files." The board also stated that when Mr. Hart left the law firm, "Mr. Hart took all the Palowsky and GSLD files." Based on these findings, the board noted that "the obligation to provide an accounting rested with Mr. Hart and Mrs. Marchman" and not the respondents.
*1161 The majority finds that the record shows that "means were available to respondents whereby they could have rendered an accounting" despite Mr. Hart's departure from their law firm. At p. 1156. Specifically, the majority cites evidence in the record that the firm retained "numerous financial documents from the Palowsky litigation, such as cancelled checks, records of deposits, and ledger entries." At p. 1156. Yet, the majority fails to address the very practical observation of the disciplinary board that, "[a]s attorneys for Mr. Palowsky and GSLD, Mr. Hart and Mrs. Marchman were the lawyers that generated the vast majority of the expenses and fees in the bank litigation matter." Accordingly, "[respondents are not in a position to interpret these [financial] documentsthat is the obligation of Mr. Palowsky's attorneys, Mr. Hart and Mrs. Marchman." Considering the above, the board and the hearing committee found that the respondents tendered a reasonable accounting by providing Mr. Palowsky with all the financial documents they had concerning monies billed and paid by Mr. Palowsky and GSLD, some 920 pages. I do not find evidence in the record which justifies the majority's departure from the findings of the hearing committee and the disciplinary board regarding this point.

Conclusion
For the reasons described above, I cannot agree that the alleged violations found by the majority were proven by clear and convincing evidence as required by our rules. Furthermore, even if I was inclined to agree with the majority on those issues, after considering all the facts and circumstances, I would impose the fully deferred suspension recommended by the disciplinary board.
NOTES
[*] Retired Judge Thomas C. Wicker, Jr., assigned as Justice ad hoc, sitting for Justice Chet D. Traylor, now retired, recused.
[1] At some point later in his representation of Mr. Palowsky, Mr. Hart brought in co-counsel, Monroe attorney Sedric Banks and New Orleans attorney Joseph R. Ward, Jr.
[2] Mr. Theus testified that he was the one who "corralled" the parties and "brought them in" to execute the new fee agreement. However, the agreement was ultimately executed for the firm by Mr. Hart and notarized by Ms. Marchman.
[3] During the negotiation of the 1996 fee agreement, Mr. Palowsky asked for an accounting from TGD & L of sums he had previously paid to the firm, and several versions of the draft fee agreement contained a provision which called for the firm to make a full accounting to Mr. Palowsky before the agreement was executed. On August 7, 1996, Mr. Spillers sent a memorandum to Mr. Palowsky attaching a revised copy of the draft fee agreement which deleted the accounting provision. The memorandum further states, "I believe we have located where all the payments were credited. Please see me if you want to review the documentation." It is unclear what "documentation" Mr. Spillers was speaking of, and Mr. Palowsky adamantly denies that he received any accounting in response to his 1996 request.
[4] The 1996 fee agreement is not dated; however, the evidence is clear that it was executed after September 4, 1996.
[5] The agreement specified that it replaced all other fee agreements regarding the Gulf States litigation, except the fee agreement governing a reconventional demand filed by Mr. Palowsky against ONB, which the parties referred to as Mr. Palowsky's "personal suit." The 1996 fee agreement specified that the personal suit "is, and remains, a separate matter governed by a separate fee agreement."
[6] ONB withheld $756,000 due to Mr. Palowsky under the judgment, claiming that it had a right to offset that sum against a personal judgment obtained by the bank against Mr. Palowsky in 1989. In October 1997, Mr. Hart and Ms. Marchman executed a writ of seizure against ONB and seized $756,000 in cash from ONB's vault. These funds were paid to Mr. Palowsky by a check from the Ouachita Parish Sheriff's Office. Mr. Palowsky, in turn, paid $288,000 of these funds to another bank in satisfaction of a judgment that bank had obtained against him. Thereafter, ONB obtained a court order directing Mr. Palowsky to return the balance of the funds to the Sheriff to be held pending the resolution of ONB's claim for an offset against its 1989 judgment. Mr. Palowsky did return the funds to the Sheriff, where they remained until the 1989 ONB judgment prescribed. In June 2001, Mr. Hart and Mr. Ward obtained a court order directing the Sheriff to release the funds to Mr. Palowsky.
[7] Mr. Hart had endorsed the check in payment of the judgment on behalf of TGD & L and then given it directly to Mr. Palowsky, rather than depositing it into the law firm's client trust account. Evidently concerned that his partners would overreach on the fee, Mr. Hart told Mr. Palowsky that he should deposit the check into Gulf States' account "and then work it out with Ed" Theus.
[8] Mr. Palowsky was under the impression that he would not be billed for legal services in connection with the loan closing. Respondents deny that they ever agreed to this arrangement.
[9] See footnote 5, supra.
[10] The firm subsequently filed an arbitration demand against Mr. Hart to resolve a dispute between them relating to the distribution of the fees paid by Mr. Palowsky after Mr. Hart's withdrawal from TGD & L, as well as the reimbursement of expenses and costs advanced by the firm in the course of the Palowsky representation. Mr. Hart died in December 2005, and as of the date of the formal hearing in the instant matter, these issues had not been resolved.
[11] Mr. Palowsky alleged that when the Gulf States settlement was distributed, he was not credited with as much as $200,000 in hourly fees and expenses he had paid prior to the execution of the 1992 fee agreement.
[12] Mr. Palowsky alleged that he gave $10,000 in cash to Mr. Spillers in May 1989 and $9,000 in cash to Mr. Theus in July 1990, but that these payments were never acknowledged or credited to his account with the firm. Respondents have denied the payments were ever made.
[13] Mr. Spillers admitted that he placed the fee agreement "in a different format" and then circulated it to his partners "for review and comments." Mr. Curry admitted that he signed the fee agreement on behalf of TGD & L and gave written notice to Mr. Palowsky that the firm intended to exercise its option to take a one-third percentage of recovery. Mr. Theus admitted that he prepared a mortgage from Gulf States to TGD & L pursuant to the 1996 fee agreement.
[14] The committee noted the 1996 fee agreement allowed the firm the option to collect its fee from the sale of subdivision lots or the subdivision in bulk. Thus, the fee could be collected if the bank litigation was lost and there was no recovery from the bank. It rejected respondents' contention that the agreement encompassed two subjectsi.e., an attorney/client relationship and a commercial joint venture relationship. Rather, the committee explained that the fee agreement has as its primary subject a means for the firm to collect a fee for handling the bank litigation. Therefore, the committee concluded it was apparent from the language of the agreement that the sale of subdivision lots was intended to pay the firm's fee for handling the bank litigation in the event the case was lost and there was no recovery.
[15] The committee noted that respondents argued that the recovery was paid directly to Gulf States, then Gulf States (apparently at the direction of Mr. Theus) paid the contingent fee to the firm together with over $14,000 in expenses. However, the committee found nothing in Rule 1.5(c) relieves attorneys of their obligations under the rule in those situations where the money is paid directly to the client.
[16] Mr. Curry was admitted to the practice of law in Louisiana in 1954; Mr. Spillers was admitted in 1977; and Mr. Theus was admitted in 1972.
[17] The committee determined that the 1996 fee agreement was per se invalid and, therefore, respondents violated Rule 1.8 by collecting a fee without a valid contingent fee agreement. We agree that respondents violated Rule 1.8, although on different grounds. Accordingly, we do not reach the question of whether the 1996 fee agreement is invalid per se.
[18] We acknowledge that Rule 1.8(a)(2) was later amended to provide that "the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction...." [Emphasis added.] However, we do not believe the addition of the requirement that the client be given notice in writing of the desirability of seeking independent counsel suggests that the attorney had no duty under the prior version of the rule to encourage his client to seek independent counsel.
[19] A common thread running through the recommendations of the committee and the board is that Mr. Hart and Ms. Marchman had some greater level of responsibility for the Palowsky representation which served to reduce the overall culpability of respondents. While Mr. Hart and Ms. Marchman may have had more contact with Mr. Palowsky, the record clearly reveals that respondents maintained an active role both in the negotiation of the fee agreements and in connection with a rendition of an accounting. Therefore, irrespective of whether any other parties may have had responsibility for the Palowsky representation, we see no basis to ignore respondents' breach of their ethical obligations to Mr. Palowsky.
[20] Mr. Spillers testified that the files taken by Mr. Hart contained the financial records, i.e., the source documents, for the Palowsky/Gulf States matters. However, Mr. Ward testified that he reviewed Mr. Hart's files and they did not contain the financial records necessary to render an accounting for Mr. Palowsky/Gulf States.
[21] The ODC also alleges that respondents violated Rule 1.5(c) by failing to produce a disbursement statement at the conclusion of the Gulf States litigation. We note a probable violation of that rule; however, under the facts presented, we believe any violation in this regard is subsumed by the Rule 1.15(b) violation.
[22] The board also found it was impossible for respondents to render an accounting because Mr. Hart took the file upon his departure from the firm. As discussed above, we conclude this finding is in error.
[1] While the majority states that the respondents have violated Rule 1.8 as a whole, the reasoning set forth to justify this position is obviously specifically rooted in the text found in Rule 1.8(a). The majority finds the business transaction at issue was not "fair and reasonable," and that the client was not given "a reasonable opportunity" to seek the advice of independent counsel in the transaction. See Rule 1.8(a).
[2] As the majority notes, it was only after the temporal period at issue in this case that Rule 1.8(a)(2) was amended to provide that "the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction...." [emphasis added].
[3] What constitutes a "reasonable opportunity" or period of time under the version of Rule 1.8(a)(2) at issue in this case could well depend upon the unique character of the client. In the present case, the several months dedicated to the drafting of the 1996 fee agreement clearly satisfied the requirements of Rule 1.8(a)(2). As the hearing committee noted, Mr. Palowsky was an "experienced litigator." The record also indicates that Mr. Palowsky was an experienced real estate developer, a profession which obviously requires the construction and analysis of complex business contracts. Thus, Mr. Palowsky was fully capable of determining whether the advice of independent counsel was necessary and had ample time and ability to act on that assessment during the extended negotiation process preceding the execution of the final 1996 fee agreement.