# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 21, 2020

Lyle W. Cayce
Clerk

No. 19-30688

Wiener, Weiss & Madison, A Professional Corporation;
Kantrow Spaht Weaver & Blitzer,

*Plaintiffs—Appellees*,

*versus*

Leslie B. Fox,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:16-CV-850

Before Barksdale, Haynes, and Willett, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Wiener, Weiss & Madison and Kantrow, Spaht, Weaver & Blitzer (the Firms) sued Leslie Fox to enforce the terms of the parties' contingency fee agreement. Fox argued that the agreement was unenforceable because, among other things, it violated certain rules of professional responsibility. The district court disagreed and granted summary judgment in favor of the Firms. We find that the agreement violates Louisiana Rule of Professional Conduct 1.8(a), so we vacate and remand.

No. 19-30688

I

In 2009, four years after Fox filed for divorce from her husband, Harold L. Rosbottom, Jr., the divorce court appointed a receiver to assume control of the couple's community estate, which consisted primarily of "state-licensed gaming enterprises" that operated in Louisiana (the Community Entities). "Less than one hour later," Rosbottom filed for Chapter 11 bankruptcy in the Western District of Louisiana, effectively transferring the contested property division from Texas family court to federal bankruptcy court. So Fox engaged the Firms.

The Firms originally agreed to represent Fox "in connection with the [] bankruptcy cases and any and all matters related to those bankruptcy cases" at an hourly rate. But because her assets were tied up in the bankruptcy proceedings, the Firms agreed to seek their fees directly from the court, payable from the community estate. On March 1, 2010, the Firms filed a "Substantial Contributions Application," seeking more than $1.2 million in fees. The bankruptcy court approved the application, and the Firms were paid their $1.2 million, plus interest.

Because the Firms believed it was "highly unlikely" that the court would approve another substantial contribution claim, but there was work left to be done, they proposed a contingency fee agreement. The agreement assigned the Firms up to a 35% interest[1] in the gross proceeds (whether cash or property) that Fox received for her claims against the bankruptcy estate and as an equity owner of the bankruptcy estate of her husband. Fox signed the agreement.

---

[1] The percentage of the contingency fee varied depending on the overall value of Fox's recovery.

No. 19-30688

By 2013, the Community Entities, whose assets had been depleted by Rosbottom's mismanagement,[2] were enjoying a positive cashflow and had satisfied much of their debt. And on May 1, 2013, the bankruptcy court approved a proposed Plan of Reorganization for the Community Entities. The Plan granted Fox a 100% interest in ABC Holding, LLC—later renamed Louisiana Truck Stop and Gaming (LTSG)—a holding company comprised of the Community Entities. However, Fox could not receive her entire interest until all creditors were paid, Louisiana gaming authorities approved the transfer, and Fox obtained a final, unappealable divorce decree and community partition.

Following the Plan's approval, the Firms informed Fox that their work was complete and that, if Fox "wanted them to stay on," she had "to increase the contingency percentage." The Firms then provided her with a revised contingency agreement, which increased the Firms' contingency fee to 40% of the gross proceeds, including her proceeds as the full equity owner of LTSG, from the bankruptcy proceedings. Fox signed the agreement.

After the new agreement (the 2013 CFA) was signed, the Firms worked to expedite the Plan's consummation, including by searching for a lender to loan LTSG funds to pay the Community Entities' remaining creditors. Business First Bank ultimately provided two loans to LTSG, which Fox, exclusively, guaranteed.

In early 2016, before Fox received full ownership and control of LTSG from the bankruptcy court, the Firms asked her to execute a new agreement. Having determined that the 2013 CFA was "unwieldy for LTSG as well as the [F]irms," and "convinced that it was not the best approach for [Fox] or

---

[2] In 2012, Rosbottom was convicted of bankruptcy fraud and money laundering and sentenced to ten years in federal prison. He was also ordered to pay restitution to Fox.

the companies," the Firms sought to amend the 2013 CFA so that the "[F]irms receive 40% of any distributions of property or cash that [Fox] receive[s] rather than any outright ownership." Though they had not done so with the previous agreements, the Firms recommended that Fox seek independent legal advice about whether to execute this new, eleven-page contingency agreement. Fox did just that, and her independent counsel advised against executing the revised agreement—advice Fox took.

Presumably (though the parties don't say exactly) relations soured between Fox and the Firms after she declined to sign the revised agreement, and the Firms eventually filed suit against Fox for breach of contract and to enforce specific performance of the 2013 CFA. In the alternative, the Firms raised a quantum meruit claim. Fox answered, in relevant part, that the Firms' claims are "barred because their fee agreements violate the Louisiana Rules of Professional Conduct" and "are void due to vagueness and ambiguity."

The parties filed cross-motions for partial summary judgment concerning Fox's claim that the Firms' failure to comply with Louisiana Rule of Professional Conduct 1.8(a) invalidated the 2013 CFA as a matter of law. On March 20, 2018, the district court granted partial summary judgment for the Firms, concluding that Rule 1.8(a), which concerns entering into business transactions with clients, did not apply to the 2013 CFA.

Two years later, the parties again filed cross-motions for summary judgment, this time concerning whether the fee-agreement modifications were "fair and reasonable" and whether the Firms' fee was "reasonable" in compliance with Rule 1.5(a). The Firms also moved to strike Fox's experts. The district court struck the experts and again granted summary judgment in favor of the Firms. Based on this ruling, the district court entered its final

No. 19-30688

judgment and ordered Fox "to specifically perform her obligations under the [2013 CFA] . . . and pay all fees, costs, and expenses due to the Firms."

Fox now appeals.

## II

Fox argues, among other things, that the Firms failed to comply with Rule 1.8(a) of the Louisiana Rules of Professional Conduct, invalidating the 2013 CFA. And because our resolution of this issue is dispositive, we do not reach Fox's other arguments on appeal.

We review the applicability of rules of ethics—a question of law—de novo,[3] and because we are sitting in diversity, we apply Louisiana law.[4]

But first, we must address the scope of our jurisdiction. The Firms argue that we do not have jurisdiction to consider whether they violated Rule 1.8(a) because Fox did not notice this issue in her notice of appeal, failing to abide by the mandatory requirements of Federal Rule of Appellate Procedure 3(c).[5] Specifically, the district court dismissed Fox's Rule 1.8(a) argument in its March 20, 2018 summary judgment order, but Fox's notice of appeal did not mention that order. Instead, she identified that she would be appealing: (1) the May 14, 2019 Judgment; (2) the May 20, 2019 Amended Judgment; and (3) the August 1, 2019 denial of Fox's Motion for Reconsideration.

---

[3] *In re: Deepwater Horizon*, 824 F.3d 571, 577 (5th Cir. 2016); *see also F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1310–11 (5th Cir. 1995); *cf. Pesantes v. United States*, 621 F.2d 175, 177–78 (5th Cir. 1980).

[4] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Bloom v. Aftermath Pub. Adjusters, Inc.*, 902 F.3d 516, 518 (5th Cir. 2018).

[5] *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988); *see also Hamer v. Neighborhood Hous. Serv. of Chi.*, 138 S. Ct. 13, 17 (2017) ("If properly invoked, mandatory claim-processing rules must be enforced.").

Rule 3(c) "requires the appellant to 'designate the judgment, order, or part thereof appealed from' in the notice of appeal."[6] The purpose of this rule, like so many rules of procedure, is to provide notice to the opposition and the court of the issues the appellant is challenging.[7] So where an appellant notices a particular judgment, we may not review other judgments "which are not expressly referred to" in the notice of appeal,[8] *unless* "the intent to appeal can be fairly inferred, and [] the appellee is not prejudiced or misled by the mistake."[9]

In *Friou*, we considered whether we had jurisdiction to consider an appeal from the district court's grant of summary judgment, even though it was not specified in the notice of appeal.[10] Instead, the notice specified the district court's denial of a motion to reconsider.[11] We held that, although the appellant's notice of appeal was imperfect, we still had jurisdiction because

---

[6] *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 884 (5th Cir. 1998).

[7] *Torres*, 487 U.S. at 318.

[8] *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1056 (5th Cir. July 1981).

[9] *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991) ("If there is an error in designating a judgment appealed, the error should not bar an appeal if the intent to appeal a particular judgment can be fairly inferred, and if the appellee is not prejudiced or misled by the mistake.").

We may also consider an unnoticed order where the appeal is from a final judgment and the unnoticed order is "inextricably intertwined with the final judgment." *New York Life Ins. Co.*, 142 F.3d at 884 (internal quotation omitted). While we need not reach whether the "intertwined with" path would also justify our jurisdiction in this case, we highlight what is certainly true of both lines of cases: we are principally concerned with ensuring fair notice to all parties and the courts. By focusing on notice, as opposed to strict construction of mechanical rules, we seek to discourage appellees' games of "gotcha" while insisting on appellants' abidance with the spirit of the Federal Rules of Appellate Procedure.

[10] 948 F.2d at 974.

[11] *Id.*

the *unnoticed* summary judgment order was the subject of the *noticed* denial of reconsideration.[12] Therefore, the appellee could fairly infer that appellants intended to appeal the underlying summary judgment order,[13] evidenced by the fact that the parties had fully briefed the issues concerning the grant of summary judgment and the appellee did not aver that it was prejudiced or misled by the imperfect notice of appeal.[14] The same is true in this case.

The Firms point out that Fox's notice of appeal did not reference the March 2018 order rejecting her Rule 1.8(a) argument. True. But though Fox's notice may not have been perfect, it was sufficient to provide us with jurisdiction.[15] As was the case in *Friou*, Fox here noticed the denial of her motion for reconsideration, and in that motion, Fox had asked the district court to reconsider its summary judgment ruling regarding Rule 1.8(a). And the Firms acknowledged the Rule 1.8(a) issue in their response to Fox's motion.[16] Therefore, the Firms could fairly infer that Fox intended to appeal the Rule 1.8(a) summary judgment ruling because it was a subject of the motion to reconsider that she did notice.[17] Further, both parties briefed the underlying Rule 1.8(a) issue in their briefs on appeal, and the Firms have not

---

[12] *Id.*

[13] *Id.*

[14] *Id.*; *see also DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 489 n.1 (5th Cir. 2018) (finding that failure to adequately brief an argument on appeal forfeits it).

[15] *Friou*, 948 F.2d at 974

[16] In their opposition to the motion for reconsideration, the Firms noted that "Fox has asked the court to reconsider its March 20, 2018 ruling on the parties' prior cross-motions for summary judgment on the applicability . . . of . . . 1.8(a)." They did not argue that this request was inadequately, untimely, or improperly raised. So, the Firms seem to have been on notice and accepted that the March 2018 order concerning Rule 1.8(a) was part of the Motion for Reconsideration.

[17] *Friou*, 948 F.2d at 974.

argued that they were prejudiced or misled by Fox's imperfect notice. Taken together, these facts and our liberal construction demonstrate that any inadequacies in Fox's notice of appeal do not deprive us of jurisdiction.

## III

Satisfied of our jurisdiction, we can turn to the law. Louisiana Rule of Professional Conduct 1.8(a) provides that "[a] lawyer shall not enter into a business transaction with a client" unless, among other things, the client is (1) advised in writing "of the desirability of seeking" the advice of independent legal counsel; and (2) given a reasonable opportunity to do so. Without question, the Firms did not advise Fox to seek the advice of independent counsel before signing the 2013 CFA, and "[a]n attorney-client contract which directly violates a disciplinary rule is unenforceable."[18] So the only question that remains is whether the 2013 CFA amounted to a business transaction, such that the Firms violated Rule 1.8(a) by failing to encourage Fox to consult with an independent attorney.

The Firms argue—and the district court concluded—that the 2013 CFA was not a business transaction because it did not convey an interest in property; it only provided the Firms a *future* claim to 40% of the proceeds of the bankruptcy proceedings, to the extent there were any. But this strained definition of "business transaction" deprives Rule 1.8(a) of its very purpose and borders on (if not crosses over into) absurdity. As members of this court have urged, Rule 1.8(a) exists to impose "prohibitions and restrictions aimed at preventing . . . conflicts" between the client's and the lawyer's own interests.[19] And as the Nevada Supreme Court ably explained, "[a] business

---

[18] *Hodges v. Reasonover*, 103 So. 3d 1069, 1073 (La. 2012).

[19] *Beets v. Scott*, 65 F.3d 1258, 1297 (5th Cir. 1995) (King, J., dissenting, joined by Politz, Garwood, Smith, and Wiener, JJ.).

transaction occurs when an attorney places himself in a position wherein the exercise of his professional judgment on behalf of his clients would be affected by his own financial interest."[20]

Contrary to the Firms' suggestion otherwise, it seems such potential conflicts are rarely more present than during a contingency fee relationship where the attorney seeks to gain a property interest in the client's business at the end of the representation. At bottom, the risk of conflict, and in turn the appearance of impropriety,[21] is certainly *no less* present where an attorney possesses a future interest in a client's property as opposed to a present interest. For example, in this case, the Firms had a financial interest in Fox obtaining a loan to pay off LTSG's creditors more quickly. Yet, it was Fox, not the Firms, who had to bear the risk of personally guaranteeing that loan. Regardless of whether paying off the creditors sooner was in Fox's best interest, it is certainly true that because of the 2013 CFA, the Firms had their own financial interest in Fox obtaining the loan.

Louisiana has not squarely answered whether a contingency fee agreement for an ownership interest in a client's company raises Rule 1.8(a) concerns, but it has recognized that at least some contingency fee agreements implicate the Rule, irrespective of the fact that contingency fee agreements,

---

[20] *In re Discipline of Hardy*, 422 P.3d 708, \*2 (Nev. July 19, 2018) (Table) (internal quotation omitted).

[21] *See Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (5th Cir. 1978) ("[W]henever an attorney is confronted with a potential for choosing between actions which may benefit himself financially and an action which may benefit the class which he represents there is a reasonable possibility that some specifically identifiable impropriety will occur."); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 807 n.1 (5th Cir. 1976) (noting that an attorney must "avoid even the appearance of impropriety" (internal quotation omitted)); *Horaist v. Doctor's Hosp. of Opelousas*, 266 F.3d 261, 266 (5th Cir. 2001) (considering the appearance of impropriety when considering whether to disqualify a client's attorney from acting as a witness.)

by their nature, provide a future interest.[22] This conclusion alone belies the Firms' argument that future interests cannot amount to business transactions.

And though few courts have addressed the exact question before us now, those who have expressly reject the Firms' argument. For instance, the Eleventh Circuit determined that a contingency fee agreement providing counsel stock in the client's corporation amounts to a business transaction.[23] The court reasoned that such an agreement carries the risk that the attorney will overreach in advising his client because of his own financial interests in the matter.[24] The Southern District of New York,[25] the Western District of Kentucky,[26] and a California state court[27]—from sea to shining sea—all

---

[22] *In re Curry*, 16 So. 3d 1139, 1154 (La. 2009) (finding that attorney violated Rule 1.8(a) where client and attorneys entered into contingency fee agreement though attorneys did not urge their client to seek the advice of independent counsel).

[23] *Mursten v. Caporella*, 619 F. App'x 832, 834-36 (11th Cir. 2015). While the contingency fee agreement here concerned an ownership interest in an LLC, not stock in a corporation, ownership interest is the LLC.-equivalent of corporate stock. *See Olmstead v. F.T.C.*, 44 So. 3d 76, 80 (Fla. 2010) ("An LLC is a type of corporate entity, and an ownership interest in an LLC is personal property that is reasonably understood to fall within the scope of 'corporate stock.'"); *cf. When the Lawyer Owns the Client: Equity Interests as Attorney's Fees*, 15 Geo. J. Legal Ethics 759 (2002) (using the terms "stock" and "ownership interest" interchangeably).

[24] *Mursten*, 619 F. App'x at 834-36.

[25] *Held & Hines LLP v. Hussain*, 2018 WL 4233809, at *4 (S.D.N.Y. July 31, 2018) (finding Rule 1.8(a) implicated where contingency agreement created possibility of firm receiving ownership interest in client's business entities).

[26] *Inst'l Labor Advisors, LLC v. Allied Res., Inc.*, 2014 WL 4211196, at *2, *6 (W.D. Ky. Aug. 25, 2014) (finding Rule 1.8(a) implicated where contingency agreement entitled firm to 5% of "net profits realized by client in the ownership, operation, or sale" of certain reserves).

[27] *Passante v. McWilliam*, 62 Cal. Rptr. 2d 298 (Cal. Ct. App. 1997) (finding rules of ethics implicated by contingency fee agreement providing 3% interest in company if deal was accomplished).

reached the same result. Similarly, the American Bar Association recognizes that a fee arrangement that results in an attorney receiving stock in exchange for his services is subject to Model Rule of Professional Conduct 1.8(a), a substantively identical rule to Louisiana's Rule 1.8(a).[28]

We agree with these courts that a contingency fee arrangement resulting in an attorney owning part of the client's business is a business transaction under Rule 1.8(a). Because the terms of the 2013 CFA give the Firms an ownership interest in LTSG, Rule 1.8(a) applies, and the Firms were required to advise Fox to seek the advice of independent counsel. Fox did not have to take this advice, but the Firms were obligated to give it. Thus, the 2013 CFA is void. To the extent the Firms seek to revert to the original CFA, executed in 2010, it is likewise void for the same reason.

## CONCLUSION

The district court misapplied Louisiana Rule of Professional Conduct 1.8(a), so we VACATE the final judgment, GRANT partial summary judgment in favor of Fox, and REMAND to the district court for consideration of the Firms' alternative quantum meruit claim.

---

[28] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. No. 00-418 (2000).